UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RODNEY E. BROWN,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>MARIA GUTIERREZ, et al.,<br><br>　　　　Defendants. | Case No. 1:20-cv-00245-DAD-EPG (PC)<br><br>FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT THIS ACTION BE DISMISSED FOR FAILURE TO STATE A CLAIM<br><br>(ECF No. 1)<br><br>OBJECTIONS, IF ANY, DUE WITHIN TWENTY-ONE (21) DAYS |

　　　　Rodney E. Brown ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action filed pursuant to 42 U.S.C. § 1983.  Plaintiff filed the complaint commencing this action on February 18, 2020.  (ECF No. 1).  On March 2, 2020, Magistrate Judge Stanley A. Boone screened the complaint, found that it failed to state a claim, provided Plaintiff with applicable legal standards, and directed Plaintiff to file an amended complaint.  (ECF No. 8).  On March 19, 2020, the case was assigned to the undersigned magistrate judge.  (ECF No. 9).  On April 27, 2020, Plaintiff filed an objection to the screening order, arguing that the screening order is "erroneous" and that a district judge should have reviewed his complaint.  (ECF No. 12).

　　　　Given Plaintiff's objections and his failure to file an amended complaint, the undersigned has screened Plaintiff's complaint, and for the reasons described below will issue

findings and recommendations to the assigned district judge recommending that this action be dismissed for failure to state a claim.

Plaintiff has twenty-one days from the date of service of these findings and recommendations to file his objections.

## I.    SCREENING REQUIREMENT

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1), (2). As Plaintiff is proceeding *in forma pauperis* (ECF No. 5), the Court may also screen the complaint under 28 U.S.C. § 1915. "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that the action or appeal fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

A complaint is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). A plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). The mere possibility of misconduct falls short of meeting this plausibility standard. Id. at 679. While a plaintiff's allegations are taken as true, courts "are not required to indulge unwarranted inferences." Doe I v. Wal-Mart Stores, Inc., 572 F.3d 677, 681 (9th Cir. 2009) (citation and internal quotation marks omitted). Additionally, a plaintiff's legal conclusions are not accepted as true. Iqbal, 556 U.S. at 678.

Pleadings of *pro se* plaintiffs "must be held to less stringent standards than formal pleadings drafted by lawyers." Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir. 2010) (holding that

1 *pro se* complaints should continue to be liberally construed after Iqbal).

2 **II.     SUMMARY OF PLAINTIFF'S COMPLAINT**

3 Plaintiff alleges as follows in his complaint:

4 Plaintiff is a state prisoner incarcerated at California Correctional Institution. Plaintiff's complaint primarily involves violations associated with his board of parole hearings, which are being denied to him. Plaintiff is not being provided with a parole review process that is consistent with the law. Instead, it is the product of personal bias, where the Board of Parole Hearing ("BPH") members and defendants in this action made it clear, off the record, that they were personally disrespected by complaints Plaintiff filed and that they would not release him on parole because of personal interests and not because of the legal parole process.

The fact that people who have a personal interest in denying parole to Plaintiff hold the parole hearings manifests a clear and established conflict of interest that interfered with Plaintiff's substantial rights, year after year since 2017, and will continue for twenty years, as Plaintiff was told by defendant Garcia.

In 1983 Plaintiff was arrested for murder. Plaintiff was convicted in 1986 and was sentenced to fifteen years to life in state prison.

On December 17, 2012, Plaintiff was granted parole after spending approximately twenty-six years in state prison. Plaintiff demonstrated adequate functional compliance regarding his good transition into society, maintained a stable residence, secured a full time job, and was very cooperative with his parole agent.

During the scope of Plaintiff's parole, Plaintiff became suspicious that his son and his wife (biological mother and son) were having an incest-type affair. Prior to Plaintiff's suspicions, Plaintiff's son reported to him that Mexican gang members were making hostile threats upon Plaintiff's son's life, and that if Plaintiff went to the police to report the gang members, their house would be set on fire and Plaintiff's son would be killed. In paranoia, Plaintiff got a gun from his friend for protection against gang members.

Plaintiff placed a listening device in his and his wife's bedroom, due to his suspicion of her having an affair with her son. Plaintiff heard his wife making sexual remarks on the

recording, and knew only their son was at the house.

Plaintiff, with gun in hand, confronted his wife about her having an affair with their son. Plaintiff did not point the gun at his wife at any time. While Plaintiff was discussing the matter with his wife, their son, Rodney Jr., entered the room. Plaintiff pointed the gun at him and said "GET OUT OF HERE."

According to the parole violation report, on July 18, 2015, Police Officer Zirkle and his partner Corporal Blleweg were assigned to uniform patrol when they received a dispatch to the residence located at 479 W. Lurelane Street, in reference to someone "brandishing a firearm." While en route the officers were informed that the reporting party had changed location because the husband had pulled a shotgun on her, and she and her son were now in a vehicle waiting at the intersection of Walnut just east of Lilac Ave. The reporting party, Ruthy, was contacted by the officers and she advised the officers that on July 18, 2015, her husband had walked into her bedroom holding a shotgun, pointed it at her, and told her to tell him the truth about what was going on with their son Rodney Jr. He then accused her of having a sexual affair with their son and threatened to kill them both with the shotgun. She stated that she was not sure if her husband (Plaintiff) was still at the home. She provided a description of Plaintiff's vehicle and as she was doing so, Plaintiff drove by in his car. The officers rushed back to the patrol vehicle and conducted a traffic stop of Plaintiff in his vehicle. Plaintiff was handcuffed and placed into the back of the patrol vehicle. Ruthy Brown was contacted to respond to the location of the traffic stop to positively identify whether the black male adult in custody was her husband who had threatened to kill her and her son. She identified her husband who threatened to kill her and her son while holding a shotgun. Plaintiff was then arrested and booked into the Rialto Police Department and then West Valley Detention Center without further incident.

Plaintiff was interviewed by officers at the time of the arrest and stated that he believed that his wife and son were having a sexual affair. He stated he placed a recording device in the bedroom and heard his wife making sexual statements and the only other person in the house was his son. He admitted to pointing the gun at his son but not his wife. He also admitted to

4

ownership of the shotgun and that he had it for several months as protection because his son had gotten into trouble with some Hispanics from Highland, but would not say where he got it from.

On July 20, 2016, Plaintiff was sentenced based upon his acceptance of a plea agreement regarding ex-felon in possession of a firearm. Plaintiff received two years in state prison for the firearm charge, which was the mid-term for the offense.

Defendants Gutierrez and Garcia performed a BPH at California Correctional Institution. The proceeding began: "DEPUTY COMISSIONER GARCIA: On the record. PRESIDING COMISSIONER GUTIERREZ: All right. We are on the record. And today's date is November 21, 2019, and the time is approximately 11:07 a.m. This is an annual parole reconsideration hearing held under Penal Code Section 3000.1, for Mr. Rodney Brown, CDCR number D-22973, who is present in the hearing room at California Correctional Institution in Tehachapi, California. Mr. [B]rown was originally received on February 3, 1986, from the County of Los Angeles. The controlling offense in this case is second-degree murder, arising from a conviction in Case Number 8392650, and resulting in a sentence of life without parole. Mr. Brown paroled on December 17, 2012."

Plaintiff corrected the Commissioner, stating "No, ma'am, excuse me. Not life without, 15 to life." This hearing was Plaintiff's fourth parole hearing and his third reconsideration hearing.

Presiding Commissioner Gutierrez asked Plaintiff, "Yes. Your third reconsideration hearing. So do you remember what they asked you to work on, on your last year?" Plaintiff responded "Yes." Gutierrez stated, "WHAT WAS THAT?" Plaintiff responded, "They said to work on, uh, guns, relationship, uh, decision, and judgment."

The judgment/decision was as follows:

Presiding Commissoner [sic] Gutierrez: Okay, we're back on the record. The time is 12:33 p.m. We have reconvened for pronouncement of the panel's Decision. All persons previously present prior to the break have returned. The fundamental consideration in an annual parole consideration hearing is whether the inmate continues to pose a current unreasonable threat to public safety upon the inmate's release. Accordingly, a denial of parole must be based upon

evidence in the record of the inmate's current dangerousness.  Having these legal standards in mind, we find that Mr. Brown does pose an unreasonable risk of danger to society or a threat to public safety and is therefore ineligible for parole today.  The Panel dis-- based its Decisions on the following reasons.  Mr. Brown, we do see that you have matured on your part.  However, there are still, uh, deep concerns for us, and one of them being that you have a general disregard for following laws.  And there's three different specific reasons.  One is the weapon.  You still need to keep digging deeper into your causative factors.  What is it about you that your're [sic] willing to take the law into your own hands, right?  Knowing that you were on parole, and you went and got a shotgun and get I get it.  You know, uh, you -- you were concerned for your son's safety.  However, you continued that theme by not even reporting the threats, right?  So you said you intended to kill those boys to protect your son.  I mean, you've already murdered someone in the past.  So why would you want to repeat the same thing again?  So that's what it means to dig into your causative factors.  What is it about you inside that you're willing to go to those extremes, right?  And then third, sadly, child molestation did occure [sic], and unfortunately to this date, same thing.  You wouldn't be willing to report a felony crime.  And so those are all themes that fall into a general disregard for following the law.  So no matter what it is, if a law is broken, it should be reported.  And it's there for a reason, right?  We have rules and laws for a reason.  And so, um, the District Attorney, you know, thought that, uh, yea, anti-police behavior, that is an issue, right?  You can't blame them.  You can't, uh use that as an excuse.  It's another issue where you really need to think about and deep -- dig deeper into, you know.  But you still have a lack of programming, so you're on the right pace.  Keep programming, figure out deep triggers, coping skills, and get into a leadership position, right?  You're 54 years old.  You're mature.  You see the younger ones that are around you.  And a lot of your classes, if you learn and internalize concepts and programs, and you facilitate, that makes it even better for you because then you -- we know that you have internalized these programs.  You don't just memorize something and come in here and just spout it out.  Now they're real, and they're unique to you individually.  Does that make sense?  Did you want to add anything, Deputy Commissioner?

Deputy Commissioner Garcia stated, "Uh, just that I concur with the Decision to, uh, deny parole today.  And, uh -- but keep working.  Keep working."

Commissioner Gutierrez stated, "Keep growing.  You're in the right – you're on the right path.  You just need to put all of this together.  Okay?  So the time is now 12:36 p.m. Thank you to everyone who participated.  This meeting -- or this hearing is adjourned."

Plaintiff alleges that defendants Gutierrez and Garcia discriminated against him, holding him accountable and denying parole based on their belief that Plaintiff is guilty of

having a disregard for the law because he did not seek to prosecute his wife for molesting his son, indirectly holding Plaintiff accountable.

Plaintiff's failure to seek prosecution against his wife for molesting their son is irrelevant to the circumstances regarding the Board's standard of review to decide whether Plaintiff poses an unreasonable risk to the public.

The Board, the police, and the District Attorney's Office had an obligation to inquire whether Plaintiff wanted to prosecute or explain why he should prosecute, since he had brought this to the attention of the law from the very beginning, even at the moment of arrest. The law failed to take legal steps to pursue prosecution against the mother who molested her biological son.

Plaintiff also had a parole reconsideration hearing in 2017. The judgment/decision was as follows: "Presiding Commissioner Taira: Today is December 7, 2017. The time is 7:07 p.m. We are reconvening this Hearing for pronouncement of the Panel's decision. All parties present when we recessed are again present. Mr. Brown -- this is the Subsequent, uh, Reconsideration Hearing for Mr. Rodney Brown…. Mr. Brown the Panel finds you unsuitable for parole --"

Plaintiff stated, "UNSUITABLE."

Commissioner Taira stated:

Unsuitable and I'll -- I'll explain how we go to that and then we will uh -- um this is a 1-year denial as, uh, Parole Reconsideration Hearings are, so this is a 1-year denial with the finding of unsuitability. According to the California Supreme Court, in making, in making a parole eligibility decision, this Panel must not act arbitrary or capriciously and must consider all relevant and reliable information available. When an inmate has committed his controlling offense under Penal Code Section 2051 prior to obtaining 23 years of age, the Board shall give great weight to the diminished culpability of juveniles as comp1ared [sic] to adults, the Hallmark Features of Youth, and any subsequent growth and maturity in reviewing suitability under Penal Code Section 3041.5. Uh, the Panel has read and considered the written record including the Central File, and the Comprehensive Risk Assessment. The risk Assessment took into consideration the Youthful Offender Factors. We also reviewed the additional documents and the Watchdox files submitted during this hearing. We looked at the confidential portion of the file, but did not rely on any information in the confidential file, uh, due to the lack of relevance. We considered the statements

made today during the testimony of Mr. Brown, uh, statements made on his behalf by his attorney and we noticed the opposition from the Los Angeles County District Attorney's Office.  The fundamental consideration in making a parole eligibility decision is the potential threat to public safety upon an inmate's release.  Accordingly, denial must be based on evidence in the record of the inmater [sic] current dangerousness.  With these legal standards and after giving great weight to the Youthful Offender considerations, [w]e find Mr. Brown does pose an unreasonable risk of danger or threat to public safety and is not currently eligible for parole at this time.  The circumstances, uh, show, suitability for parole, and the record does reflect some of those, uh, namely the Youthful Offender considerations, the -- in that Mr. Brown committed the life crime when he was 18 years old and with diminished culpability compared to that of an adult, taking into consideration a number of factors, including the development and psychology of brain science and that the brain continues to evolve in behavior controle [sic] through late adolescence in areas such as impulse controle [sic], planning ahead and risk avoidance.  There arethe [sic] transit characteristics in that juveniles are more capable of change than adults and the differences as time goes by between juveniles and adult mind enhances the prospect that, um, that deficiencies will be reformed over time.  There's the vulnerability of youth and juveniles are more vulnerable and susceptible to outside pressures and negative influences including family and peers, and in this case, Mr. Brown's case, he was heavily involved in gang activity at the time of the life crime, involved with the Cripps.  The crime itself was a gang-related shooting, and that exposure to deviant peers leads to increased deviant behaviors and is a predicator of adolscent [sic] delinquency.  Uh, juveniles also have a limited control over their environment and lack of the ability to extricate themselves in crime producing settings, uh, the background, mental, and emotional development of the juvenile is a mitigating factor and the family and home environment, um, is also a mitigating factor, because, juveniles cannot usually extricate themselves, and there were aspects in Mr. Brown's, uh -- uh, life, uh, as a child where he suffered some traumatic events, such as being scalded and the, uh, sexual, uh, contact he had with the, uh, -- the 15-yearold [sic] when he was 11.  There is the susceptibility to deterrence in that juveniles are less susceptible to deterrence than adults because of their lack of maturity and underdeveloped sense of responsibility that leads to impetuous and ill-considered actions and decisions without taking punishment into consideration.  Un [sic], there is also the mistrust of the Criminal Justice System, and the mistrust of the adults and limited understanding of the Justice System, can lead juveniles to work less effectively in their own defense.  Juveniles have difficulty weighing long-term consequences, and with their impulsiveness and reluctance to trust Counsel can lead to poor decisions and their legal representation.  The Panel considered the exhibited Hallmarks of Youth at the time of the crime, and that as compared to adults juveniles have a lack of maturity and underdeveloped sense of responsibility that lead to recklessness, impulsivity and heedless risk taking.  There is also the transient rashness and proclivity for risk and the inability to assess consequences.  The Panel also considered to the extent Mr.

Brwon [sic] has shown growth, maturity, and rehabilitation during incarceration, relative to his age at the time of the crime, and his current age, he's 53[,] juveniles should not be deprived of the opportunity to achieve maturity and maturity leads to remorse, renewal and rehabilitation. Youth must have the ability to demonstrate, reflective or growth. The Panel did give great weight to those. Those were given great weight at the, um -- uh, to those factors, in, uh, evaluating suitability. We also looked at his age. He's 53 years old, well past the age that reduced recidivism. When he committed the crime, he was 18. We start to see recidivisim [sic] decrease around the age 40. Mr. Brown is well past [sic] that. Parole Plans are increasingly realistic. Mr. Brown has arranged for, uh, the Amity House, a Transitional Home, and he understand the, uh, the need for that. He also has shown the ability to engage in Institu -- positive Institutional activities. He's done a number of programs, self-help programs, um, during his incarceration that we ralked [sic] about on the record. More recent ones had to do with anger, criminal thinking. He's done CGA. He talked about the Family Relations Workshop that was helpful for him. Um, ultimately, the Panel found that these were outweighed by the circumstances that tended to show unsuitability and suggest that if released, Mr. Brown continues to pose a threat to public safety. The Commitment offense for which he was committed for the life crime was, uh, just a horrific and, um, vicious crime, uh, done when he was 18. A gang-related drive by shooting that resulted in the murder of, uh, of the victim. We also looked at the unstable and violent history of Mr. Brown, uh, the sporadic attendance at school, the, uh, early involvment [sic] with gang activity, uh, specifically the Cripps, history of drug and alcohol abuse, um, and the gang-related, negative antisocial behavior, uh, fights, and criminal activity related to that. Now the California Supreme Court has ruled after a long period of time, those immutable factors such as the commitment offense, prior criminal, and unstable history may no longer indicate a current risk of danger to society in light of a lengthy period of positive rehabilitation. So, we – in this case, we considered any other circumstances coupled with the other cir -- immutable circumstances that lead us to the conclusion that Mr. Brwon [sic] continues to pose a threat to public safety um, the -- the Panel found that indicates current risk of danger was the recent relapses into the criminal behavior, uh, specifically the criminal behavior that lead to the possession of the shotgun, uh, a firearm while Mr. Brown was on parole, uh, he knew he was prohibited from owning a shotgun, but yet, when he had to deal with a family crisis and felt threatened, it was the -- the one thing that turned to that, uh, he clearly knew was prohibited. This was in July of 2015, uh, when his son was being threatened by other -- other members out in the co -- out in the neighborhood, and then what followed, uh, was a series of really poor decisions, uh, which reflected that ongoing criminal thinking, uh, the hiding of the shotgun for, um, a certain period of months and then finally bring it out and ending up brandishing it during a family altercation, so that impulse to brandish the shotgun or have it at the time, uh, of this, uh, extremely emotional event indicated that Mr. Brown, uh, hasn't learned to control the impulses and relapsed back into that criminal behavior that got him in trouble in the first place as a Youth Offender, uh, but yet at this time, he

was much, much older, uh, well past his, uh, adulthood, and this was in 2015, so very, very recent, for the panel, that gave us a nexus for current dangerousness, Commissioner.

Deputy Commissioner O'Hara then stated:

I agree with the Chair, you know, it's a- it's tragic that you're sitting in that chair once again, because you spent all that time getting rehabilitated and doing everything to be found suitable for parole, that you were not an unreasonable risk to society, and you were given all the benefits of being a Youthful Offender, 18 when you committed your crime, all the time you've been in custody, most of your 115s were early on, so they were said to be, uh, things you've grown from, and you said everything right, you did everything right, and the Panel decided this gentalman [sic] is not an unreasonable risk to society, so let's put him out on supervised release.  Keep -- somebody keep an eye on him just to make sure our decision is correct, and you proved them wrong, because the sad part is, you didn't just make one bad dicision [sic], you made a bunch of them, and setting aside the weird relationship between your wife and son, that's really immaterial to the Panel.  It's a fact that, huh, get offered a gun, take a gun, hide a gun, forget that you even have it when you're on parole, and you hide it outside.  It's kind of similar to how the gangs do it, they'll leave it here or there and somebody can pick it up, and then when you get into an argument with your family, that gun comes out.  That is criminal thinking.  Why would you need a gun for an argument with your family, unless your [sic] threatening them like complete strangers where they're a threat to you, and it didn't seem like there was any of that, but to -- to show your dominance, to exert your will, you back it up with a gun.  That's exactly what you did as a kid, shooting up the neighborhood, killing somebody, that's the same mentality, and so you have brought yourself around a 50 -- this was 2015, so call it 50 years of age to still have that mentality, and that's tragic at this age that that's how you would deal with conflict, and deal with these issues.  It does make you an unreasonable risk to society.  Everything we feared, everything that brought you to prison just came right be up again when you were stressed tested, and you failed, and so you have taken a couple of course and we commend you for that, and you're going to have to not only explain -- well you are going to have to explain why this, after all those years, and you're telling the Board I'm good to go, I got it, how when push come to shove, you didn't just make one bad decision, a number of them, and they each one would indicate to us a criminal mentality.  You're going to get away with it, uh, it's just a shotgun, it's for protection.  We've never had anybody come in here and say I got the shotgun because I'm going to kill everybody, it's oh I got there is knife, I got this gun, it's for protection, same answer, and so we're truly sad that you're in that seat again, because you have done so well for a long and now you got to kind of start again, and you're not going to have the benefit of Youthful Offender, because that had to do with your original commitment offense,  you didn't know that -- how this was going to play out.  They do stupid stuff and then we have to kind of say, well, it doesn't make grown up, but now as a grown up, 50 years old, about in 2015, you're

back to doing those kid things again, which makes us think you haven't grown up, but at 50, you're expected to be grown up, so we give you 1-year denial. You do pose an unreasonable risk to society at this point. You're going to have to redouble your efforts and prove to us that you're not going to fall again. It's going to take some work. Good luck to you.

Plaintiff responded, "ALL RIGHT."

Commissioner Taira stated:

We also noted that the Comprehensive Risk Assessment that Dr. Barckley prepared, which took into consideration the diminished culpability of juveniles as compared to adults, the Hallmark Features of Youth, and any subsequent, uh -- um, parole violation and found -- and found Mr. Brown presents a statistically moderate risk of violence which is an elevated risk, and that we found that was supportive of our decision today. This decision becomes final after a 120[-]day review period by the Board of Parole Hearings and then there is an additional 30 days for the Governor's review, so 150[-]day review period. If there are any changes Mr. Brown will be notified in writing. As I indicated earlier, this is a 1-year denial, based on the uh, rules and regulations, governing the Reconsideration Hearings. We make the following recommendations: No more 115s or 128As, stay disciplinary free, earn positive chronos and continue with your -- your self-help sir, uh, particularly with regard to the -- the issues that we discussed during the course of this hearing. We're going to adjourn the hearing now, the time is 7:25 p.m. This hearing is adjourned.

Plaintiff also had a parole reconsideration hearing in 2018. After the same detailed denial as stated in December of 2017, as reflected above, it was "extremely" the same in 2018. Commissioner Barton stated, "So, after review of the evidence, the Panel has determined the circumstances and gravity of the revocation violation does warrant -- uh -- remaining in custody for 12 months. You will be scheduled for a subsequent lifer reconsideration hearing in 12 months. Uh, -- the Panel finds that the reasons for unsuitability outweighs those for suitability and -- uh -- that is the decision today. It is 11:30[.] We're adjourned."

At Plaintiff's 2019 hearing, off the record, Plaintiff asked if he was going to be released in one year, and defendant Garcia responded "TIMES TWENTY," and walked away.

At Plaintiff's 2017 review, off the record, Commissioner Taira said to Plaintiff, "You think we are going to release you? You came back and disrepected [sic] us after we let you go. Sorry sir but this is personal, plus you allowed your son to be molested and you still refuse to do anything about it." Plaintiff stated, "WHAT? ALLOWED MY SON TO BE MOLESTED?

11

ARE YOU CRAZY, I TOLD THE POLICE WHAT WAS GOING ON, WHY THE POLICE DIDN'T DO ANYTHING ABOUT IT, IF IT WAS A MAN AND A GIRL, HE WOULD HAVE BEEN PUT AWAY FOR LIFE RIGHT.  BUT INSTEAD OF GOING AFTER THE MOTHER, YOU STILL COME AFTER THE MAN, ME… FOR SOMETHING I DID NOT DO?" Mr. Taira stated, "YOU DO NOT UNDERSTAND." Plaintiff stated, "HELP ME UNDERSTAND." Mr. Taira stated, "YOU HAVE PLENTY OF TIME FIGGURE [SIC] IT OUT."

The BPH had been deliberately misapplying the true standards of review by being extremely arbitrary, capricious, and discriminative, based upon their personal interests to see that Plaintiff fails to be released because Plaintiff had somehow personally disrespected BPH officials.  Thus, Plaintiff was denied a true and correct standard of review, as BPH had a predisposition to deny Plaintiff's BPH as an act of reprisal for personally disrespecting the Board.

Plaintiff alleges that Defendants and all BPH members retried him of the evidentiary findings of the court and other authority, in violation of the relevant standards, and in order to deny him parole.

Personal disrespect falls short of criteria used for BPH determination.  It is not within all "reliable information available" to the Panel for the termination or suitability of parole.  It constitutes arbitrary and capricious misconduct that highly prejudiced Plaintiff's Parole Determination Process, because personal interests were applied and used to carry out the goal of personal interest denials, which directly disregarded the real BPH determination procedures and protocols, thereby denying Plaintiff a full and fair hearing in the absence of a predisposition to deny Plaintiff parole for disrespecting BPH by violating parole and coming back to prison.

Plaintiff alleges that his hearings should be conducted by impartial persons, not by persons that take a personal interest in the denial or revoking of his parole status, such as the defendants in this case.

Defendants retaliated against Plaintiff by denying him parole because they were

personally offended or disrespected by him. Plaintiff's First Amendment rights to expression, speech, and his ability to participate in an impartial hearing were violated, as he moved to exercise these rights, and Defendants retaliated against him by denying his parole reconsideration again and again.

Plaintiff was chilled by the prospect that, year after year, he would face the same BPH, and could not afford to offend them, because of fear of retaliation.

Plaintiff was informed off the record that his attacks with complaints were not going to do him any good, and that it is only making things worse for him. Because Plaintiff had previously filed appeals and letters challenging the integrity and process of the previous parole hearings, on November 21, 2019, defendant Garcia knew that Plaintiff would also challenge the 2019 decision to deny parole. Plaintiff enraged Defendants and the BPH by filing appeals, letters, and challenges to the BPH determination, "MAKING THAT A MORE PERSONAL INTEREST TO FURTHER PUNISH PLAINTIFF BY DENYING HIM A FAIR AND IMPARTIAL BPH REVIEW."

Plaintiff brings a Fourteenth Amendment due process claim, an Eighth Amendment retaliation claim, and a First Amendment retaliation claim.[1]

### III.   ANALYSIS OF PLAINTIFF'S CLAIMS

**A.  Section 1983**

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor,

---

[1] In addition to listing these as the only claims in his complaint, Plaintiff has specifically stated that he only brought a due process claim, an Eighth Amendment retaliation claim, and a First Amendment retaliation claim. (ECF No. 12, p. 7).

490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)); see also Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 618 (1979); Hall v. City of Los Angeles, 697 F.3d 1059, 1068 (9th Cir. 2012); Crowley v. Nevada, 678 F.3d 730, 734 (9th Cir. 2012); Anderson v. Warner, 451 F.3d 1063, 1067 (9th Cir. 2006).

To state a claim under section 1983, a plaintiff must allege that (1) the defendant acted under color of state law, and (2) the defendant deprived him of rights secured by the Constitution or federal law. Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006); see also Marsh v. Cnty. of San Diego, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state law"). A person deprives another of a constitutional right, "within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" Preschooler II v. Clark Cnty. Sch. Bd. of Trs., 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)). "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." Preschooler II, 479 F.3d at 1183 (quoting Johnson, 588 F.2d at 743). This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause." Arnold v. Int'l Bus. Mach. Corp., 637 F.2d 1350, 1355 (9th Cir. 1981); see also Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008).

A plaintiff must demonstrate that each named defendant personally participated in the deprivation of his rights. Iqbal, 556 U.S. at 676-77. In other words, there must be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff. See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691, 695 (1978).

### B. Due Process and Parole Hearings

"There is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence, and the States are under no duty to offer parole to their prisoners. When, however, a State creates a liberty interest, the Due Process Clause requires fair

procedures for its vindication—and federal courts will review the application of those constitutionally required procedures." Swarthout v. Cooke, 562 U.S. 216, 220 (2011) (citation omitted).

Under the Due Process Clause, the standard analysis "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." Id. at 219. "The liberty interest at issue here is the interest in receiving parole when the California standards for parole have been met…." Id. at 221. As to what procedures are required, "[i]n the context of parole, [the Supreme Court has] held that the procedures required are minimal." Id. at 220. All that is required is an opportunity to be heard and a statement of reasons why parole was denied. Id.; see also Miller v. Oregon Bd. of Parole & Post Prison Supervision, 642 F.3d 711, 716 (9th Cir. 2011) ("The Supreme Court held in *Cooke* that in the context of parole eligibility decisions the due process right is *procedural*, and entitles a prisoner to nothing more than a fair hearing and a statement of reasons for a parole board's decision….").

However, "[b]ecause parole board officials perform tasks that are functionally comparable to those performed by the judiciary, they owe the same duty[] to render impartial decisions in cases and controversies that excite strong feelings because the litigant's liberty is at stake." O'Bremski v. Maass, 915 F.2d 418, 422 (9th Cir. 1990) (citation and internal quotation marks omitted). A prisoner is entitled to have his parole hearings conducted by a parole board that is "free from bias or prejudice." Id.

Here, Plaintiff alleges that he received a statement of reasons for each BPH decision, and he has not alleged that he was not given an opportunity to be heard. Thus, Plaintiff was provided with the procedures required by the Due Process Clause.

While Plaintiff attempts to allege that the hearings were not free from prejudice, he has not sufficiently done so. Plaintiff alleges that Commissioner Taira told him that the parole denial was personal, because he disrespected the parole board after they let him go. However, Commissioner Taira is not named as a defendant in this case. Moreover, Plaintiff already received two parole reconsideration hearings after the reconsideration hearing with

1   Commissioner Taira, and Plaintiff was denied parole both times.  These subsequent hearings do
2   not appear to have been conducted by Commissioner Taira.
3         As to Plaintiff's most recent parole board decision, the 2019 decision, Plaintiff alleges
4   that Deputy Commissioner Garcia and Commissioner Gutierrez discriminated against him.
5   Plaintiff alleges that, after Plaintiff asked if he was going to be released in one year, defendant
6   Garcia responded "TIMES TWENTY."  However, this response alone does not show any bias
7   against Plaintiff.
8         Plaintiff also alleges that defendant Garcia knew Plaintiff was going to appeal the
9   decision because he previously appealed parole decisions, but there are also no allegations
10  suggesting that the decision by the 2019 parole board was influenced by the fact that Plaintiff
11  previously filed grievances and complaints.[2]
12        To the extent that Plaintiff disagrees with the reasons given by Defendants for not
13  granting parole, Plaintiff's allegations do not state a due process claim because due process
14  does not entitle Plaintiff to a review by a court regarding whether the parole hearing produced
15  the result that the evidence required.  Swarthout, 562 U.S. at 221.  To the extent that Plaintiff
16  alleges that Defendants misapplied state law, "a mere error of state law is not a denial of due
17  process."  Id. at 222 (citation and internal quotation marks omitted).
18        Thus, even taking all non-conclusory allegations as true and construing the complaint
19  liberally in favor of Plaintiff, it appears that Plaintiff received all the process he was due.
20  Therefore, Plaintiff has failed to state a claim based on a violation of the Due Process Clause.
21        **C.  Retaliation[3]**
22        A retaliation claim requires "five basic elements: (1) an assertion that a state actor took
23  some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and

---

[2] Plaintiff does allege that he was informed off the record that his attacks with complaints were not going to do him any good, and that it is only making things worse for him.  However, Plaintiff does not allege who told him this, allege when he was told this, or provide any allegations suggesting that Defendants denied him parole in retaliation for his filing of complaints or grievances.

[3] While it appears that at least one circuit may recognize an Eighth Amendment retaliation claim in a situation such as this, see, e.g., Meuir v. Greene Cty. Jail Employees, 487 F.3d 1115, 1119 (8th Cir. 2007), in the Ninth Circuit such a claim is addressed as a First Amendment retaliation claim.  As there is no separate Eighth Amendment retaliation claim, Plaintiff has failed to state an Eighth Amendment retaliation claim.

that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted); accord Watson v. Carter, 668 F.3d 1108, 1114-15 (9th Cir. 2012); Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009).

While prisoners have no freestanding right to a prison grievance process, see Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir.2003), "a prisoner's fundamental right of access to the courts hinges on his ability to access the prison grievance system," Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir.1995), overruled on other grounds by Shaw v. Murphy, 532 U.S. 223, 230 n.2 (2001). Because filing administrative grievances and initiating civil litigation are protected activities, it is impermissible for prison officials to retaliate against prisoners for engaging in these activities. Rhodes, 408 F.3d at 567.

Plaintiff has alleged that he engaged in protected conduct, that is, the filing of complaints and grievances. However, Plaintiff has failed to connect the adverse action (denial of parole) to his protected conduct. While Plaintiff alleges that that he was informed off the record that his attacks with complaints were not going to do him any good, and that it is only making things worse for him, Plaintiff does not allege who told him this, allege when he was told this, or provide any allegations suggesting that Defendants denied him parole in retaliation for his filing of complaints or grievances. In fact, Plaintiff seems to allege that he was denied parole because Defendants were "disrespected" by Plaintiff committing a crime after being granted parole.

Accordingly, Plaintiff has failed to state a retaliation claim.

## IV.     CONCLUSION AND RECOMMENDATIONS

The Court finds that Plaintiff's complaint fails to state any cognizable claims.

The Court does not recommend granting further leave to amend because Judge Boone explained to Plaintiff why his complaint failed to state a claim and provided Plaintiff with an opportunity to amend his complaint with the benefit of applicable legal standards, but Plaintiff

\\\

\\\

declined to amend his complaint.[4]

Accordingly, based on the foregoing, it is HEREBY RECOMMENDED that:

1. This action be dismissed for failure to state a claim; and
2. The Clerk of Court be directed to close the case.

These findings and recommendations will be submitted to the United States district judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within twenty-one (21) days after being served with these findings and recommendations, Plaintiff may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **June 25, 2020**          /s/ Erica P. Grosjean
                                  UNITED STATES MAGISTRATE JUDGE

---

[4] While the Court is not recommending that Plaintiff be granted leave to amend, the Court will vacate these findings and recommendations if Plaintiff files an amended complaint in response.